HADSELL STORMER RENICK & DAI LLP
DAN STORMER [S.B. #101967]
SHALEEN SHANBHAG [S.B. #301047]
128 N. Fair Oaks Avenue
Pasadena, CA 91103
Tel: (626) 585-9600 / Fax: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        sshanbhag@hadsellstormer.com

UC IRVINE SCHOOL OF LAW
INTELLECTUAL PROPERTY, ARTS & TECHNOLOGY CLINIC
PRESS FREEDOM AND TRANSPARENCY PRACTICE
SUSAN E. SEAGER [S.B. #204824]
JACK LERNER [S.B. #220661]
P.O. Box 5479
Irvine, CA 92616-5479
Tel: (949) 824-5447 / Fax: (949) 824-2747
Emails: sseager1.clinic@law.uci.edu
        jlerner@law.uci.edu

Attorneys for Plaintiffs
JONATHAN PELTZ and KATHLEEN GALLAGHER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| JONATHAN PELTZ and KATHLEEN GALLAGHER,<br><br>                    PLAINTIFFS,<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, a public entity, and DOES 1 through 10 inclusive,<br><br>                    DEFENDANTS. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>1. Violation of First & Fourteenth Amendments (42 U.S.C. § 1983; Cal. Const., art. 1, § 2(a))<br>2. Violation of Fourth & Fourteenth Amendments (42 U.S.C. § 1983)<br>3. Denial of Liberty (14th Amendment; 42 U.S.C. § 1983)<br>4. Municipal Liability (42 U.S.C. § 1983)<br>5. California Civil Code § 52.1<br>6. Negligence<br>7. False Arrest/False Imprisonment<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES &
INJUNCTIVE RELIEF                    -1-

## I.       INTRODUCTION

1.       This is a civil rights action challenging the Los Angeles Police Department's ("Police Department" or "LAPD") longstanding policy, custom and practice of obstructing, targeting, and retaliating against members of the press for exercising their First Amendment rights to gather news regarding police officer activity in public places, particularly during protests against police brutality and misconduct.

2.       The First Amendment right to observe and film police officers as they interact with the public is an essential part of news gathering and benefits the public by providing them with visual information on law enforcement's practices. Nearly thirty years ago, the Ninth Circuit Court of Appeals recognized a First Amendment right to report about and film police officers during a public demonstration. *Fordyce v. City of Seattle*, 55 F.3d 436, 439, 442 (9th Cir. 1995) (recognizing protester's "First Amendment right to film matters of public interest" when filming police actions during public protest and "First Amendment right to gather news"). As recently as 2020, the Ninth Circuit found that police officers' harassment of journalists reporting about and filming Black Lives Matter protests "'chilled' the exercise of their First Amendment rights." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020). "[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).

3.       The First, Third, Fifth, Seventh and Eleventh Circuits have recognized the First Amendment right to observe and film police activities in public. *See Fields v. City of Philadelphia*, 862 F.3d 353, 359-60 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014); *ACLU of Illinois v. Alvare*, 679 F.3d 583, 600 (7th Cir. 2012); *Smith v. City*

*of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). As the First Circuit put it: "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

4.      The U.S. Department of Justice has also recognized that this First Amendment right to record police officers in public is "consistent with our fundamental notions of liberty, promote[s] the accountability of our governmental officers, and instill[s] public confidence in the police officers who serve us daily." Statement of Interest of the United States at 1, *Sharp v. Baltimore City Police Dep't*, No. 11 Civ. 2888 (D. Md. Jan. 10, 2012), ECF No. 24.

5.      Notwithstanding this clearly established First Amendment right, on March 25, 2021, LAPD police officers arrested Plaintiffs Jonathan Peltz and Kathleen Gallagher – journalists reporting for Knock LA– without probable cause. Plaintiffs were lawfully and peacefully observing, newsgathering, reporting live, videotaping, and photographing a public protest and related police activity from a public sidewalk. They were arrested despite clearly identifying themselves as journalists and being surrounded by other journalists engaged in similar conduct.

6.      Los Angeles City Attorney Michael Feuer declined to press charges against Plaintiffs.

7.      The LAPD's unlawful arrest of Plaintiffs was not an isolated event. The LAPD has an extensive history of violating the rights of journalists covering Los Angeles demonstrations, such as during the 2007 Immigrant Rights march,[1] 2014

---

[1] https://www.democracynow.org/2007/5/3/journalists_covering_los_angeles_immigration_march

Ferguson protests,[2] and 2020 Black Lives Matter protests.[3] This custom, pattern, and practice is the result of LAPD officers' inadequate training regarding the First Amendment right of the press and the public to report about and record police activities in public, a failure to supervise and discipline LAPD police officers who retaliate against or interfere with this right, and the deliberate indifference by LAPD supervising personnel to a culture of disregard for the constitutional right to record police activity in public.

8.    At least 13 journalists, and likely more, were arrested or detained in Los Angeles, California, while documenting demonstrations near Echo Park Lake on March 25, 2021, as reported to the U.S. Press Freedom Tracker, on social media and in other news outlets[4].

9.    Unlawful arrests and police brutality against journalists is a national problem. Since 2020, police have assaulted journalists across the country nearly 600 times and made more than 200 arrests of journalists.[5]

10.    While most of the arrests in 2020 were made of journalists covering Black Lives Matter protests, most of the arrests in 2021 and 2022 have been of journalists covering police evicting unhoused people from their encampments.[6]

11.    By arresting Plaintiffs, LAPD police officers violated their clearly established rights under the First Amendment to the United States Constitution and Article 1, section 2(a) of the California Constitution. The LAPD officers also violated

_____

[2] https://www.latimes.com/local/crime/la-me-1129-protest-arrests-20141129-story.html

[3] https://www.latimes.com/opinion/story/2021-12-07/los-angeles-police-journalists-arrests-reforms

[4] https://pressfreedomtracker.us/blog/at-least-60-journalists-have-sued-police-following-arrests-assaults-at-protests/

[5] https://pressfreedomtracker.us/assault/; https://pressfreedomtracker.us/arrest-criminal-charge/

[6] https://pressfreedomtracker.us/all-incidents/?categories=4&date_lower=2021-01-01&date_upper=2021-12-31

Plaintiffs' clearly established rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, excessive force, and arrest without probable cause. In committing these constitutional violations, the LAPD officers were acting pursuant to the City's longstanding policy, custom, and practice of restricting or retaliating against the press as they attempt to gather news on police activity, as well as failing to observe the rights of the press and public to record conduct in public. The LAPD officers' arrest and detention of Plaintiffs also violates the California Tom Bane Civil Rights Act, Civil Code section 52.1, by using threat, intimidation, and coercion to interfere with the Plaintiffs' exercise of their constitutional rights.

12.    With this civil rights suit, Plaintiffs seek declaratory relief for the violation of their constitutional rights, compensatory and punitive damages for Defendants' unlawful actions, and injunctive relief directing the LAPD to institute an effective policy to train its police officers on the First Amendment right of the press and public to record police activity in public locations and to appropriately discipline police officers who violate this constitutional right.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 based on questions of federal constitutional law and 42 U.S.C. § 1983. This Court has jurisdiction to issue declaratory or injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

14.    This Court has jurisdiction over claims arising under the laws of the State of California pursuant to the supplemental jurisdiction provided by 28 U.S.C. § 1367(a).

15.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because all of the events giving rise to the claims herein occurred in

the Central District of California.

## III.    PARTIES

16.    Plaintiff JONATHAN PELTZ was working as a reporter, photographer, and videographer for local news website Knock LA before and during his wrongful arrest. He is a resident of the County of Los Angeles.

17.    Plaintiff KATHLEEN GALLAGHER was working as a reporter, photographer, and videographer for local news website Knock LA before and during her wrongful arrest. She is a resident of the County of Los Angeles.

18.    At all times material herein, Defendant CITY OF LOS ANGELES was and is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

19.    Defendant MICHEL MOORE, is and was, at all times relevant to this action, and the LAPD police chief and a policymaker for his department. He is sued in both his individual and official capacities.

20.    The true names of defendants DOES 1 through 10, inclusive, are not now known to Plaintiffs who therefore sue these Defendants by fictitious names. Upon ascertaining the true name of a DOE Defendant, Plaintiffs will amend this complaint, or seek leave to do so, by substituting the true name for the fictitious name. Plaintiffs are informed and believe, and based thereon allege, that each DOE Defendant is in some manner responsible for the injuries and damages listed in this Complaint.

21.    At all times material herein, defendants were each acting as the employee, agent representative, and officer of every other defendant herein, and within the course and scope of such employment and agency. All defendants were

COMPLAINT FOR DAMAGES &
INJUNCTIVE RELIEF                -6-

acting under color of state law.

## IV.    FACTUAL BACKGROUND

22.    Knock LA is an independent, non-profit news website (https://knock-la.com/) covering Southern California that started in 2017.  Since its founding, Knock LA has published over 700 articles, accrued over 3.3 million pageviews, earned tens of millions of impressions on social media, and currently reaches over 100,000 readers each month. Knock LA published a fifteen-part investigative series on deputy gangs within the Los Angeles County Sheriff's Department that has received over 750,000 pageviews. Knock LA's original reporting has been featured and cited in *The Los Angeles Times*, National Public Radio, *Columbia Journalism Review*, and a number of academic journals over the past five years.

23.    On October 30, 2020, LAPD Deputy Chief, Chief of Staff from the Office of the Chief of Police Dominic N. Choi drafted a memo to "All Department Personnel" announcing LAPD's press policy during street protests (the "LAPD DATE Press Policy").  Members of the press obtained the memo.  The memo states "[m]edia representatives have a legitimate interest in providing the public with information" on public protests, and  "remind[s]" officers to allow "media representatives [to remain] behind skirmish lines" after declaring an unlawful assembly directed at protesters, "that the Department WILL recognize individuals who self-identify as media representatives," "will NOT require specific media credentials," and recognizes that "**the inability [of reporters] to produce identification does not preclude an individual from acting as a member of the media**."  **Exhibit A** (emphasis in original).

24.    Other LAPD policies and training similarly recognize the media's First Amendment rights. For example, the LAPD's Media Relations Handbook states: "The Los Angeles Police Department recognizes that the news media has the right, without interfering with police operations, to cover events that may result in the

declaration of an unlawful assembly and order to disperse. To the extent reasonably possible under the circumstances, the LAPD will make efforts to accommodate this reporting obligation. However, such efforts will be made consistent with the LAPD's primary obligation to maintain public safety and order."

25.     The LAPD's Media Relations Handbook further provides: "[W]henever the LAPD develops an operations plan for an event that the Department understands will involve a public assembly, the Department will, where practicable, designate an area outside of the anticipated, impacted area, but within reasonable viewing distance and audible range of the event, in which members of the news media may assemble." The Handbook also states: "To the extent reasonably possible without compromising public or officer safety or police tactics, the [Incident Commander] will relocate the news media viewing area if, due to changing conditions, the initial area no longer affords the news media reasonable view of the event or becomes a tactical concern for the IC."

26.     The LAPD's Use of Force-Tactics Directive on Crowd Management, Intervention, and Control states: "It is the Department's goal to provide the media as much access as legitimately possible to assist them in their duties."

27.     On the early evening of March 25, 2021, at about 5 p.m., Knock LA reporters Peltz and Gallagher arrived near Echo Park Lake to report about a public demonstration at protesting the LAPD's plan to forcibly remove dozens of unhoused people living in tents along the shores of the lake. Knock LA editors had previously assigned them to report on this demonstration.

28.     Peltz and Gallagher walked together down Lemoyne Street toward the lake but were blocked from reaching the lake by a line of protesters, who were blocked by a line of LAPD officers standing along Park Avenue, approximately 50 feet away from the lake. Several other reporters and television camera crews were also stopped behind the line of protesters and were reporting from the scene.

29.    Plaintiffs stood on the sidewalk on Lemoyne Street near the Angeles Temple to observe and report about the protests and actions of the LAPD officers for Knock LA. Peltz reported about the protest and police actions from the scene by live tweeting photographs, videos, and information on his Twitter account.[7] Gallagher observed the protest and police actions and took photos.[8]



lapd is videotaping protesters





148 views          0:06 / 0:29

7:50 PM · Mar 25, 2021 · Twitter for iPhone

Jon peltz
@JonnyPeltz

another one in blue lives matter gear



6:21 PM · Mar 25, 2021 · Twitter for iPhone

30.    Around 5:30 p.m., black and white LAPD patrol cars with loudspeakers pulled up near the intersection of Lemoyne Street and Park Avenue near the lake and directed the protestors to "get off the corner of Echo Park & Lemoyne." The LAPD

---

[7] https://twitter.com/JonnyPeltz/status/1374957882660155394?s=20&t=hWxvV3V ToZiVTJIbnkEHFw; https://twitter.com/JonnyPeltz/status/1375256455536762882 ?s=20&t=hWxvV3VToZiVTJIbnkEHFw
[8] https://knock-la.com/who-keeps-us-safe/.

COMPLAINT FOR DAMAGES &
INJUNCTIVE RELIEF                    -9-

officers established various skirmish lines around the lake.

31.     Around 7:45 p.m., Plaintiffs heard some LAPD officers say something on a loudspeaker but could not make out the contents of the message because of the crowd's chanting and playing drums.

32.     At 8:10 p.m., Plaintiffs heard LAPD officers say, "members of media disperse now." At the time of this announcement, Plaintiffs stood on the sidewalk on Lemoyne Street along with other journalists and photojournalists, several hundred feet from the lake, and several feet behind the LAPD skirmish line. Plaintiffs made an effort to stay out of the LAPD officers' way and did not interfere with their actions.

33.     At some point during the protest, Plaintiffs learned from other reporters that the LAPD was telling reporters to go to the media staging area on the other side of the Angelus Temple.  Plaintiffs did not move to that location because it did not have any view of the protesters on Lemoyne Street or a clear view of the police action against the unhoused people along the lake. This location did not offer Plaintiffs "reasonable viewing distance and audible range of the event" in violation of the LAPD Media Relations Handbook and the LAPD's Directive on Crowd Management, Intervention, and Control.  (See "LAPD Designated Media Viewing Area" depicted in image below).



34.    Peltz observed the other journalists and photojournalists remain on the Lemoyne Street sidewalk behind the police skirmish line and behind the protesters. At this time, the protestors started to move backwards from the lake and away from police. In response, Plaintiffs and the other journalists began backing up Lemoyne Street and stood near the Angelus Temple.

35.    Around 8:20 p.m., one group of police officers left their position near

Park Avenue and rushed up Lemoyne Street toward the protesters and journalists while another group of police officers rushed onto Lemoyne Street from an unnamed alley and formed a rear skirmish line, trapping the journalists and the protestors between two lines of officers. The trapping maneuver is known as kettling, a law enforcement crowd-control technique also known as "trap and detain," where cordons of police officers surround members of the public, confining and immobilizing them. Here, despite ordering everyone to leave, LAPD officers kettled the protestors and the journalists and prevented anyone from leaving the area. The LAPD's Echo Park Rehabilitation After Action Report determined that approximately 180 people were kettled in this area.

36.    Shortly after their kettling maneuver, LAPD officers became aggressive and began conducting mass arrests of the kettled protesters and journalists.

37.    At this time, LAPD officers began firing "less lethal" munitions into the crowd. According to the LAPD's Echo Park Rehabilitation After Action Report, the Department documented firing five 40-millimeter foam rounds, twelve bean bag sock rounds, and six 37-millimeter foam baton rounds.

38.    As they were being arrested, both Peltz and Gallagher identified themselves as members of the press. Both wore Knock LA's red T-shirts with the organization's white logo of a raised fist. But the LAPD officers ignored Plaintiffs' statements and arrested Plaintiffs outside Angeles Temple, about 150 feet away from the fence at the northern edge of Echo Park Lake.

39.    Peltz asked the LAPD officer for the reason for his arrest, and the arresting officer said he did not know the reason.

40.    The LAPD's wrongful arrest of Plaintiffs violated the LAPD's October 30, 2020 Press Policy that required officers to allow "media representatives [to remain] behind skirmish lines" after declaring an unlawful assembly, "recognize individuals who self-identify as media representatives," "NOT require specific

media credentials," and its recognition that "**the inability [of reporters] to produce identification does not preclude an individual from acting as a member of the media**." (emphasis in original). It further violated the LAPD's policies requiring officers to "accommodate [the media's] reporting obligation."

41. The arresting officers bound Plaintiffs' wrists with plastic zip ties, patted them down, confiscated their cell phones and other belongings, and asked them to fill out paperwork. The police officers placed Plaintiffs on separate buses.

42. The windows of Peltz's bus were closed and LAPD officers did not enforce COVID-19 protocols in place at the time. Many of the approximately 50 detainees were not wearing their masks properly and were unable to pull up their masks due to being bound. Peltz's bus arrived at the LAPD's Metropolitan Detention Center, not to be confused with the federal Metropolitan Detention Center, around 10:00 p.m. Gallagher's bus arrived at the same detention center around 10:30 p.m. Plaintiffs remained zip tied at the detention center for the entirety of their processing, until their release. By the time the bus arrived at the detention center, Peltz's wrists swelled and his shoulders hurt.

43. Finally, at 12:30 a.m. on March 26, 2021, about four hours after being arrested, Plaintiffs were released by police. Police officers gave Plaintiffs citations for allegedly violating California Penal Code § 409, and released Plaintiffs based on their promise to appear in court. Plaintiffs were among 182 people arrested that night for violating California Penal Code § 409.

44. On the night of March 26, 2021, Peltz went to an urgent care to receive an anti-inflammatory shot for his swollen arms and hands. He also noted that his left hand was numb, and he had back pains. The urgent care center documented the swelling on the arms and hands and noted that the cause was likely from a pinched nerve in his hand. Peltz felt numbness in his hands for three to four months after his arrest.

45.    On the same day they were released by the LAPD, Peltz and Gallagher co-wrote a news article about the protest and police actions, which was published on Knock LA later that day; the article included some of Gallagher's photos.[9]

46.    On April 6, 2021,Chief Moore announced that the LAPD was working to reform its press pass process.[10]  Chief Moore admitted that "the current system [was] criticized for being too narrow, too cumbersome and too slow, as well as leaving out freelance journalists."  Indeed, from January 2021 through March 2021, the LAPD processed no press passes due to a software malfunction.

47.    On June 11, 2021, Los Angeles City Attorney Michael Feuer issued a press release, stating that his office would not press charges against individuals who were arrested on March 25, 2021 for alleged failure to disperse at Echo Park lake, saying there was no legal basis to do so: "Free speech and peaceful protest are fundamental to our democracy," Feuer said in the written statement. "These peaceful protesters did not threaten public safety and it would not be in the interest of justice to prosecute them."

## V.    MONELL ALLEGATIONS

48.    Defendant City of Los Angeles, through Defendant Moore and the LAPD, has failed to train its officers in the constitutional responses to peaceful demonstrations, as revealed in this Complaint's allegations. The City has a custom and practice of using kettling, unlawful and/or inadequate dispersal orders, excessive force, and arresting journalists without probable cause in an attempt to stop journalists from documenting public police brutality.

49.    In the years leading up to the Echo Park protest, the City of Los Angeles has settled several class action lawsuits that resulted in changes to LAPD policies, procedures, and training regarding kettling, dispersal orders, excessive

---

[9] https://knock-la.com/who-keeps-us-safe/

[10] https://spectrumnews1.com/ca/la-east/public-safety/2021/04/06/lapd-chief-says-credential-process-needs-reform-after-journalists--detentions

---

force, and arrests during demonstrations. These settlement agreements and changes
are documented in Appendices 5–8 in the March 15, 2021 Independent Examination
of the LAPD Response to 2020 Protests.[11]

50.    Chief Moore, as well as members of his command staff, were aware of
the ongoing unlawful policies, practices, and customs regarding the use of kettling,
unlawful and/or inadequate dispersal orders, and unlawful mass arrests to break up
lawful protests when the Echo Park protest occurred on March 25, 2021. Despite
these settlements and the independent examination of the LAPD policies,
procedures, and training surrounding protests, these unlawful policies, practices, and
customs continued under the City and Chief Moore's command to the Plaintiffs'
detriment.

51.    The need for officer training and discipline to enforce constitutional
guarantees in such circumstances is obvious and necessary. The City has known of
the deficiencies in its training as a result of the class action settlements, and agreed
to revised policies and training, yet failed to implement policies effectuating the
settlement agreements and/or to train its command staff and officers on revised
policies, if any exist.  The current unlawful crowd control, media relations, and use-
of-force policies and the long-standing customs and practices of the Defendants do
not meet constitutional requirements.

52.    On information and belief, Chief Moore delegated responsibility and
authority to persons within his command staff to act as the final policy maker in
determining the response to the Echo Park Lake protest.  The persons who made
these decisions, acted as the delegated policymaker for the City of Los Angeles on
these issues.  There was no time, opportunity, or procedure for anyone to review or
revise the decisions made by these delegated policymakers prior to their final
implementation.

_____

[11] https://clkrep.lacity.org/onlinedocs/2020/20-0729_rpt_CLA_03-11-21.pdf

53.     According to the LAPD's Echo Park Rehabilitation After Action Report, the LAPD generated twelve personnel complaints regarding its officers' conduct at the Echo Park protests.

## VI.    COMPLIANCE WITH PRE-SUIT REQUIREMENTS

54.     On September 24, 2021, within the limitation period after the claims herein arose, Plaintiffs served a Notice of Claim on the City of Los Angeles in compliance with Gov't Code § 911.2.

55.     On November 18, 2021, the County gave notice that it had rejected Plaintiffs' claim.

56.     This action has been commenced within the applicable limitations period for the claims asserted herein.

## FIRST CLAIM FOR RELIEF

**Freedom of Speech (1st Amendment; 42 U.S.C. § 1983 and Article 1, § 2(a) of California Constitution)**

(Plaintiffs Against All Doe Defendants)

57.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

58.     Defendants' conduct, described above, violated Plaintiffs' rights to freedom of speech and the press under the First Amendment to the United States Constitution and Art. 1, § 2 of the California Constitution.

59.     Plaintiffs attended the March 25, 2021 Echo Park protest as journalists reporting for Knock LA. By arresting Plaintiffs without cause and despite their repeated assurances of their press status, Defendants violated Plaintiffs' First Amendment rights to report on the protest as members of the press.

60.     The LAPD declared an unlawful assembly without justification during a lawful protest that posed no threat and gave inadequate dispersal orders.

61.     Defendants did not have probable cause to arrest Plaintiffs. Even after

LAPD declared the protest an unlawful assembly, Plaintiffs had the right to continue reporting on the protest. Nevertheless, Plaintiffs, along with many other members of the press, were not given the opportunity to leave the scene due to LAPD's kettling.

62.     Defendants violated Plaintiffs' First Amendment rights of freedom of speech and press by arresting them for performing their jobs as journalists to document the actions of police officers and protesters in a public place.

63.     Plaintiffs suffered harm as a direct and proximate result of Defendants' actions, including but not limited to physical injury and pain and suffering. Plaintiffs are entitled to recover compensatory damages directly and proximately caused by the Defendants' unlawful arrest.

64.     The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

## SECOND CLAIM FOR RELIEF

**Unreasonable Seizure, Excessive Force, and False Arrest (4th Amendment; 42 U.S.C. § 1983)**

(Plaintiffs Against All Doe Defendants)

65.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

66.     Defendants' conduct, described above, including arresting Plaintiffs, detaining Plaintiffs, and restraining Plaintiff Peltz such that his hands, arms, and shoulder became swollen and pinched a nerve in his hand, violated their Fourth Amendment right to be free from unreasonable seizures, excessive or arbitrary force, and arrest or detention without reasonable or probable cause.

67.     As a direct and proximate consequence of the Defendants' unlawful actions, Plaintiffs have suffered loss of income arising from the March 25, 2021

incident and from covering future demonstrations and protests due to fear of similar unlawful actions, emotional harm, and Plaintiff Peltz has suffered several physical injuries including a pinched nerve.

68.    The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

### THIRD CLAIM FOR RELIEF

### Denial of Liberty (14th Amendment; 42 U.S.C. § 1983)

(Plaintiffs Against All Doe Defendants)

69.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

70.    Plaintiffs had a liberty interest created by the California Penal Code § 853.6 to be cited and released for a misdemeanor and not subjected to a prolonged detention. Defendants' conduct deprived Plaintiffs of liberty without due process of law under the Fourteenth Amendment to the United States Constitution. Based on Plaintiffs' perceived association with the March 25, 2021 demonstration, Plaintiffs were uniformly denied the mandatory "liberty" interest codified at California Penal Code § 853.6 when they were denied individualized assessment and detained on a bus that violated COVID-19 safety protocols.

71.    The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

/ / /

/ / /

/ / /

**FOURTH CLAIM FOR RELIEF**

**Municipal Liability—Unconstitutional Policy, Practice, Custom and Failure to Train and/or Discipline (42 U.S.C. § 1983)**

(Plaintiffs Against Defendants City and Moore)

72.    Plaintiffs repeat, reallege, and incorporate by reference all allegations contained in all previous paragraphs as though fully set forth at length herein.

73.    As described above, the acts of Defendant Does, acting under the color of law, deprived Plaintiffs of their rights under the United States Constitution.

74.    Based on the aforementioned facts, Defendants City and Moore maintained unconstitutional customs, practices, and policies of restricting or retaliating against the press for attempting to gather news on police activity, inadequate training regarding the First Amendment right of the press and the public to record police activities in public, detaining members of the press without probable cause, and inadequate discipline of police officers who violate constitutional rights of the press.

75.    Defendants City and Moore had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Defendants City and Moore also acted or failed to act with deliberate indifference to both the foreseeable consequences of these policies and to Plaintiffs' constitutional rights.

76.    As a direct and proximate result of the aforementioned acts or omissions of Defendants City and Moore, Plaintiffs have suffered loss of income arising from the March 25, 2021 incident and from covering future demonstrations and protests due to fear of similar unlawful actions, emotional harm, and Plaintiff Peltz has suffered several physical injuries including a pinched nerve.

77.    The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the

imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

## FIFTH CLAIM FOR RELIEF

### Violation of the Bane Act (Cal. Civil Code § 52.1)

(Plaintiffs Against All Defendants)

78.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

79.    California Civil Code, Section 52.1 (the Tom Bane Civil Rights Act) states "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States [...] may institute and prosecute in his [...] own name on his [...] behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1.

80.    As alleged herein, LAPD unlawfully arrested, detained and intimidated Plaintiffs in order to interfere with Plaintiffs' constitutional right to report about the public protest, the police eviction of the people living in a tent city along the shore of Echo Park Lake, and police actions that night.

81.    By unlawfully arresting and detaining Plaintiffs while they exercised their First Amendment right to document a demonstration, LAPD officers used threat and intimidation to interfere with Plaintiffs' rights secured under the Constitution of the United States. LAPD officers kettled Plaintiffs and other journalists and refused to let Plaintiffs leave, despite Plaintiffs identifying themselves as members of the press. LAPD officers intentionally exercised threat

and intimidation against Plaintiffs to punish them for filming and reporting about the March 25, 2021, demonstration. The Defendants' actions violated the Bane Act.

82.    Plaintiffs are entitled to an injunction pursuant to California Civil Code § 52.1. Plaintiffs are also entitled to damages pursuant to Civil Code §§ 52 and 52.1.

83.    The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

## SIXTH CLAIM FOR RELIEF

### Negligence

### (Plaintiffs Against All Defendants)

84.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

85.    The conduct of Defendants as set forth herein, was tortious in that Defendants breached their duty of care to Plaintiffs when Does 1-10 arrested, detained on a bus in violation of COVID-19 protocols, and restrained Plaintiffs' with zip ties for an extended period of time.

86.    Defendants City and Moore failed to supervise, review, and ensure that its officers abided by the standards of care and failed to enact appropriate standards, procedures, and training that would have prevented such harm to Plaintiffs.

87.    As a direct and proximate consequence of the Defendants' unlawful conduct, Plaintiffs have suffered emotional harm and Plaintiff Peltz has suffered several physical injuries including a pinched nerve and has incurred resulting medical expenses.

88.    The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the

wrongdoers and deter future misconduct.

## SEVENTH CLAIM FOR RELIEF

### False Arrest/False Imprisonment

(Plaintiffs Against All Defendants)

89.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in all previous paragraphs as though fully set forth at length herein.

90.     Defendant City's employees and agents at the LAPD, while acting within the scope and course of their duties, intentionally and unlawfully restrained and confined Plaintiffs unlawfully violated Plaintiffs' personal liberty by kettling Plaintiffs, refusing to let them disperse, and restraining them for a prolonged period.

91.     As a direct and proximate consequence of the Defendants' unlawful conduct, Plaintiffs have suffered emotional harm and Plaintiff Peltz has suffered several physical injuries including a pinched nerve and has incurred resulting medical expenses.

92.     Defendant City is liable for acts of its employees and agents pursuant to respondeat superior and California Government Code § 815.2(a).

93.     The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages in an amount adequate to punish the wrongdoers and deter future misconduct.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

94.     A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above;

95.     A preliminary and permanent injunction requiring Defendant LAPD to undergo annual training on the First Amendment rights of journalists;

96.     A preliminary and permanent injunction requiring Defendant LAPD to

1    adopt a policy that all LAPD employees must cite and release reporters on their own

2    recognizance if arrested for non-violent citations while reporting about or filming

3    public events;

4         97.     A declaratory judgment that Defendants' conduct detailed herein was a

5    violation of the rights under the Constitution and laws of the United States and

6    California and of the Plaintiffs;

7         98.     General and compensatory damages for Plaintiffs for the violations of

8    their federal constitutional and statutory rights, all to be determined according to

9    proof;

10        99.     Punitive damages for Plaintiffs according to proof;

11       100.    An award of attorneys' fees pursuant to 42 U.S.C. 1988;

12       101.    Costs of suit;

13       102.    Pre- and post-judgement interest as permitted by law;

14       103.    Such other and further relief as the Court may deem just and proper.

15

16    DATED: May 9, 2022                Respectfully submitted,

17                                      HADSELL STORMER RENICK & DAI LLP

18

19                                      By: /s/ *Shaleen Shanbhag*

20                                      SHALEEN SHANBHAG
                                         *Attorney for Plaintiffs*

21                                          *Jonathan Peltz and Kathleen*

22                                          *Gallagher*

   DATED: May 9, 2022                UC IRVINE SCHOOL OF LAW

23                                      INTELLECTUAL PROPERTY, ARTS &

24                                      TECHNOLOGY CLINIC

25                                      By: /s/ *Susan Seager*

26                                      SUSAN E. SEAGER
                                         *Attorney for Plaintiffs*

27                                          *Jonathan Peltz and Kathleen*

28                                          *Gallagher*